ATTACHMENT A

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the District of Massachusetts (together "the Offices"), and Raytheon Company ("Raytheon" or the "Company"). Raytheon hereby agrees and stipulates that the following information is true and accurate. Raytheon admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Should the Offices pursue the prosecution that is deferred by this Agreement, Raytheon agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts establish beyond a reasonable doubt the charges set forth in the criminal Information attached to this Agreement.

**Relevant Entities and Individuals**

1. The Company is a subsidiary of RTX Corporation ("RTX"), a defense contractor. Both Raytheon and RTX are headquartered in Arlington, Virginia. RTX, formerly known as Raytheon Technologies Corporation, is publicly traded on the New York Stock Exchange. RTX is the result of a 2020 merger between Raytheon Company and United Technologies Corporation.

2. The Company was headquartered in Waltham, Massachusetts, before the merger with United Technologies. The conduct described herein occurred at Raytheon Company prior to the merger with United Technologies.

3. "Raytheon Employee 1," an individual whose identity is known to the Offices and the Company, was a Contracts Manager who negotiated and oversaw the contract administration on a contract between the U.S. Army and Raytheon known as "3-Lot" (described further below).

4. "Raytheon Employee 2," an individual whose identity is known to the Offices and the Company, was a Contracts Director who negotiated and oversaw the contract administration on 3-Lot and supervised Raytheon Employee 1.

5. "Raytheon Employee 3," an individual whose identity is known to the Offices and the Company, was a Vice President of Contracts who supervised Raytheon Employees 1 and 2.

6. "Raytheon Employee 4," an individual whose identity is known to the Offices and the Company, was a Program Manager who had managerial and negotiation responsibilities for a contract awarded to Raytheon by the U.S. Air Force, known as "Follow-on Support 2" or "FOS2" (described further below).

7. "Raytheon Employee 5," an individual whose identity is known to the Offices and the Company, was a Senior Director who supervised Raytheon Employee 4.

### The 3-Lot and FOS2 Foreign Military Sales Contracts

8. As described below, between at least 2013 and at least 2018, Raytheon, through its employees, engaged in schemes to defraud the United States in connection with two foreign military sales ("FMS") contracts that the U.S. Department of Defense awarded to Raytheon for the benefit of Partner-1. Through the FMS program, the United States may use the Department of Defense's acquisition system to procure defense articles and services on behalf of international partners.

9. In 2013, the U.S. Army awarded Raytheon an FMS contract valued at approximately $600 million (contract number XXXXXX-XX-X-0069), pursuant to which

Raytheon sold three PATRIOT[1] missile fire units to the U.S. Army for the benefit of Partner-1 (the "3-Lot" Contract).

10. In 2017, the U.S. Air Force awarded Raytheon an FMS contract valued at approximately $300 million (contract number XXXXX X -XX-X-0002) known as FOS2 pursuant to which Raytheon provided upgrade and sustainment services for the Partner-1 Surveillance Radar Program ("SRP"), a radar system for the benefit of Partner-1.

11. 3-Lot and FOS2 (hereinafter, the "Contracts") were sole source, firm fixed price contracts. Sole source contracts are not open to competitive bidding—they involve a single contractor. In a firm fixed price contract, a contractor and the United States agree to a total, up-front cost that is not subject to any future cost adjustments that are based on the contractor's actual expenses during contract performance. Accordingly, in a firm fixed price contract, if a contractor performs the contract at a greater cost than originally awarded, the contractor bears the additional costs and makes less profit. Alternatively, if the contractor performs the contract at a lower cost than originally awarded, the contractor collects the cost-savings and makes a larger profit.

12. In order to create informational parity between the United States and federal contractors, the Truthful Cost or Pricing Data Act, formerly known as TINA, 10 U.S.C. §§ 3701-3708; 41 U.S.C. §§ 3501-3508, requires contractors bidding sole source contracts to certify the accuracy and completeness of cost and pricing data provided to the United States during contract negotiations. These certifications are known as "TINA Certificates." In the absence of a

---

[1] PATRIOT is an acronym for Phased Array Tracking Radar to Intercept On Target. Raytheon is the sole manufacturer of the PATRIOT, which is a surface-to-air missile system used by the U.S. Army and international partners through the United States's FMS program.

competitive bidding process, the United States relies on truthful cost and pricing data submitted with a TINA Certificate to negotiate a fair price with contractors.

## Overview of the Schemes to Defraud

13.     From 2012 through 2013, and again from 2017 through 2018, Raytheon, through its employees, knowingly and with the intent to defraud, made false and material misrepresentations about the cost of the Contracts in its proposals and negotiations with the United States.  Raytheon engaged in these schemes to defraud in order to convince the United States to award the Contracts at an inflated price, thereby increasing Raytheon's profits.

## The 3-Lot Contract Scheme

14.     Beginning in or around 2009, Raytheon began discussing an FMS contract with the U.S. Army to provide seven PATRIOT missile fire units for the benefit of Partner-1.  In the course of negotiations, the U.S. Army decided to award two separate contracts, the first for four fire units (the "4-Lot" Contract), and then the 3-Lot Contract for three fire units.

15.     In or around 2009, Raytheon began performance on the 4-Lot Contract pursuant to an Undefinitized Contract Action ("UCA"), meaning that Raytheon began execution without arriving at a contract price, understanding that it would eventually arrive at price agreement with the United States.  In or around 2011, the U.S. Army agreed to pay $679,819,000 for Raytheon to perform the 4-Lot Contract.

16.     Raytheon began performance on the 3-Lot Contract in or around March 2011, also pursuant to a UCA.

### *Raytheon's Proposal for the 3-Lot Contract*

17.     Raytheon tracked the financial performance of the 4-Lot Contract through the use of Estimates at Completion ("EACs"), which Raytheon prepared quarterly and distributed internally to employees working on the 4-Lot and 3-Lot Contracts.[2]

18.     Through the EAC process, Raytheon employees learned early in Raytheon's performance that the 4-Lot Contract would cost significantly less for Raytheon to perform than what Raytheon had proposed and been awarded by the U.S. Army.  Raytheon did not share the 4-Lot EACs with the U.S. Army during price negotiations for the 3-Lot Contract.

19.     Notwithstanding the cost underruns, Raytheon Employee 1 proposed to the U.S. Army that Raytheon submit the 3-Lot proposal using a comparative pricing approach ("Comparative Pricing Approach") that relied on the same cost and pricing data Raytheon used for the 4-Lot Contract proposal.  Raytheon Employee 1 and other Raytheon employees told the United States that using the Comparative Pricing Approach would be more efficient than designing an entirely new proposal because the United States planned to award the 3-Lot Contract close in time to the proposal and award of the 4-Lot Contract.  The Comparative Pricing Approach used the recent 4-Lot Contract proposal as a baseline for the 3-Lot Contract proposal. Raytheon then made limited adjustments to reflect that the 3-Lot Contract was for one less missile fire unit than the 4-Lot Contract and that there could be some efficiencies from the contracts being performed close in time.

---

[2] Raytheon relied on EACs to track the performance and calculate the profitability of each contract, including the 4-Lot and 3-Lot Contracts, and to prepare Raytheon's overall financial reporting.  EACs represented the estimated total cost to complete a contract at any given point in time.  The EACs were calculated by adding the actual costs to date for a contract to the estimated remaining cost to complete the contract.

20. On or about March 6, 2012, Raytheon Employee 1 submitted Raytheon's 3-Lot proposal using the Comparative Pricing Approach. In submitting the proposal, Raytheon Employee 1 and other Raytheon employees did not disclose the significant cost underruns that they knew were occurring on the 4-Lot Contract performance and that were reflected in Raytheon's internal EACs. Nor did the Comparative Pricing Approach account for the significant cost underruns.

21. In connection with the Comparative Pricing Approach proposal for the 3-Lot Contract, Raytheon Employee 1 sought a TINA Certificate waiver from the U.S. Army. This waiver would have allowed Raytheon to receive the contract without having to certify that the cost and pricing data in the 3-Lot Contract proposal was current, accurate, and complete, per TINA.

22. On or about August 15, 2012, the U.S. Army accepted Raytheon's proposal to use the Comparative Pricing Approach in its bid but denied Raytheon's request for a TINA Certificate waiver. The U.S. Army required Raytheon to submit a TINA Certificate certifying that its cost or pricing data was current, accurate, and complete at the conclusion of price negotiations for the 3-Lot Contract.

23. In order to move forward with price negotiations on the 3-Lot contract, Raytheon Employee 1 falsely certified in a TINA certificate that the "cost or pricing data . . . submitted . . . in support of [Partner-1] Patriot 4-Lot are accurate, complete, and current as of 12 October 2012." Prior to providing the TINA Certificate, Raytheon employees, including Raytheon Employee 1, conducted a "TINA Sweep," which was an internal Raytheon procedure that required the relevant Raytheon employees to confirm that the cost and pricing data provided to

the government was still current, accurate, and complete, and, if not, to update the data and disclose the change to the government.

24. The TINA Certificate was false because, in fact, Raytheon continued to experience significant cost underruns on the 4-Lot Contract. For example, in the 4-Lot EAC for the Second Quarter of 2012, prepared in or around June 2012, Raytheon increased its booking rate on the 4-Lot Contract to nearly 25% of the total contract value. Raytheon had previously negotiated a roughly 15% profit rate with the government at contract award.

### *The False March 2013 TINA Certificate*

25. On or about March 27, 2013, the U.S. Army and Raytheon agreed on a price of $618,920,129 for the 3-Lot Contract. Before awarding the final contract, the U.S. Army required Raytheon to provide an updated TINA Certificate certifying that Raytheon's cost and pricing data was current, accurate and complete as of the date of contract agreement (March 27, 2013).

26. Raytheon Employee 1 and Raytheon Employee 2 pushed back against the United States' request that Raytheon provide an updated TINA Certificate that certified the accuracy of the cost or pricing data as of March 27, 2013. Instead, they proposed a modified TINA Certificate that would re-certify that the data Raytheon provided was current, accurate, and complete as of October 12, 2012. This was the same date used on the prior, false TINA Certificate.

27. The U.S. Army refused to accept Raytheon's modified TINA Certificate and insisted that Raytheon certify that the cost or pricing data provided was current, accurate, and complete as of March 27, 2013 (not October 12, 2012).

28. At the time, Raytheon employees involved in negotiations with the United States, including Raytheon Employee 1, Raytheon Employee 2, and Raytheon Employee 3, knew of the

significant cost underruns on the 4-Lot Contract. In the 4-Lot EAC for the First Quarter of 2013, Raytheon again showed an increase in the profit rate. This time the profit rate increased to 31.77% of the total contract value.

29.  Raytheon employees did not want to undertake another TINA Sweep to confirm the accuracy of the cost or pricing data. On or about March 26, 2013, a Raytheon employee sent an email to Raytheon Employee 2 noting that "[w]ithout the price agreement, we may be risked to start 'fact finding' and 'negotiation' which represent only bad news."

30.  On or about March 26, 2013, Raytheon legal counsel advised Raytheon Employee 1, Raytheon Employee 2, and other employees that they could not provide a TINA Certificate certifying to a date later than October 12, 2012 without performing another internal TINA Sweep.

31.  Ultimately, in order to receive the contract award, Raytheon employees decided to provide a new TINA Certificate with an updated date, but without conducting an additional TINA Sweep. Raytheon Employee 1 refused to sign this new TINA Certificate. Instead, his supervisor, Raytheon Employee 2, agreed to sign the updated TINA Certificate.

32.  Prior to providing the updated TINA Certificate, Raytheon Employee 2 consulted a Raytheon attorney, who advised Raytheon Employee 2 not to update the TINA Certificate without conducting an internal TINA Sweep. Given the significant cost underruns during Raytheon's performance of the 4-Lot Contract, a TINA Sweep would have shown that Raytheon's cost estimates for that contract were overstated and no longer an accurate comparison for the 3-Lot Proposal.

33.  Despite the Raytheon attorney's advice, Raytheon Employee 2 signed and provided a TINA Certificate for the 3-Lot Contract to the U.S. Army on or about March 29,

2013, without performing a TINA Sweep of the 4-Lot Contract data. In the TINA Certificate, Raytheon Employee 2 falsely and fraudulently attested that the cost or pricing data submitted in support of the 3-Lot Contract proposal was accurate, complete, and current as of March 27, 2013. In doing so, Raytheon Employee 2 intended, at least in part, to benefit Raytheon.

34. On or about March 29, 2013, Raytheon Employee 2's supervisor, Raytheon Employee 3, emailed the U.S. Army falsely stating that he "had [his] team sweep the elements of the price analysis to insure they are current, accurate and complete" and that the "only" area of concern was the cost of the proposal itself, which had increased, but which Raytheon agreed to waive. Raytheon Employee 3 falsely reported to the U.S. Army that the costs *increased* due to the proposal, despite the fact that the Company's costs to perform the 4-Lot Contract had actually *decreased*, resulting in a nearly 15% increase in its profit rate on the contract.

35. After providing the false TINA Certificate to the U.S. Army, Raytheon Employee 2 directed a subordinate to memorialize in an internal memorandum, which was not disclosed to the U.S. Army, Raytheon's decision to provide the false March 29, 2013 TINA Certificate. The memorandum made clear that Raytheon Employee 2 and others did not conduct a new TINA Sweep.

36. As a result of Raytheon's fraud in connection with the 3-Lot Contract negotiations, the U.S. Army agreed to a contract price that was fraudulently inflated by $100,131,000.

### The FOS2 Contract Scheme

37. Between 2013 and 2017, Raytheon operated SRP for Partner-1 pursuant to a Cost-Plus Fixed Fee FMS contract known as "FOS1." The U.S. Air Force awarded FOS1 to Raytheon for the benefit of Partner-1. In order to operate the radar, Raytheon employed individuals in

Partner-1's capital, and at a remote radar site. Raytheon employees who maintained the radar lived at the radar site and were known as "maintainers."

38. The conditions at the radar site were challenging. The location was inhabited by dangerous wildlife, and the site itself could only be reached by a treacherous road and was routinely impacted by severe weather. In order to recruit employees to the radar site, Raytheon paid maintainers lucrative incentives known as "emoluments" as part of their compensation agreements, which were called memoranda of understanding ("MOUs").

### *Raytheon Bids FOS2 to the United States with the Lucrative Emoluments, While Simultaneously Planning to Cut Those Emoluments and Book the Savings as Profit*

39. Beginning in or around the spring of 2017, Raytheon employees started preparing a bid proposal for FOS2, a new contract with the U.S. Air Force for Raytheon to continue operating the radar after the expiration of FOS1 at the end of 2017.

40. As early as June 2017, while preparing the FOS2 proposal, Raytheon employees, including Raytheon Employee 4, began to evaluate potential reductions to the emoluments for the maintainers.

41. In or around the summer and early fall of 2017, Raytheon employees considered whether to incorporate emolument reductions into Raytheon's proposal for the FOS2 contract. These reductions would have resulted in cost-savings to the United States if they had been included in the proposal.

42. At the same time, Raytheon Employee 4 identified potential emolument reductions as an "opportunity," a term used at the company to designate ways in which costs could be decreased and profits increased during the performance of a contract. Potential opportunities – including one identified as "staffing efficiencies" – were listed in presentations circulated to Raytheon employees, including Raytheon Employee 5 and Raytheon Employee 5's

supervisor, as part of the proposal review in or around September 2017. Raytheon employees circulated drafts of a "Risks and Opportunities" spreadsheet that reflected evolving assessments of the "Probability Factor" of achieving these opportunities during FOS2. Certain of the spreadsheets included columns labeled "Revised Position (post [Employee 5])" and "Revised Position (post [Employee 5's supervisor])." The "staffing efficiencies" opportunity ultimately became the emolument cuts.

43. On or about September 25, 2017—in an email sent to more than three dozen Raytheon employees with the subject line, "Expectations for SRP FOS2"—Raytheon Employee 5 instructed, "This is being bid as an FFP, and all risks need to be bid in, and need to have adequate opportunities."

44. Ultimately, Raytheon employees, including Raytheon Employee 4 and Raytheon Employee 5, decided to submit a proposal to the United States that included the emoluments at the lucrative FOS1 levels, which the company did on or about October 6, 2017. The proposal did not disclose the potential reductions to the emoluments that Raytheon employees had been discussing internally.

45. After submitting the FOS2 bid, Raytheon employees continued to plan for emolument reductions. For example, Raytheon employees had three "FOS2 MOU SHAPING" meetings, led by Raytheon Employee 4, in or around October and November 2017 at which they analyzed and identified reductions to the FOS2 emoluments.

46. On or about November 22, 2017, after Raytheon Employee 4 and others had identified emolument reductions for FOS2, Raytheon Employee 4 reported to her supervisor, Raytheon Employee 5, that she and another individual had "been working . . . on opportunities to reduce MOU impact on [FOS2]" but noted that the result of that effort would not be known until

after the contract had been negotiated and the TINA Certificate completed.  Accordingly, by in or around the end of November 2017—despite representing to the United States that Raytheon needed to fund the emoluments at FOS1 levels—Raytheon Employee 4 and others had developed a plan to reduce the emoluments paid to maintainers on the upcoming FOS2 contract, and to reallocate any savings over FOS2 funding levels to profit.

### *DCMA Recommends that the United States Reduce the Emoluments, but Raytheon Insists that FOS1-Level Emoluments are Essential to the Project's Success*

47.     In or around November 2017, as part of the FOS2 negotiation process, the Defense Contract Management Agency ("DCMA"), which is part of the U.S. Department of Defense, conducted an audit of certain of the "highest dollar value / highest risk elements" of Raytheon's FOS2 proposal.  Among other things, DCMA found that certain emoluments Raytheon had proposed—including Difficulty to Staff Incentive Differential ("DSID"), Hardship, Per Diem, Completion Bonus, and Remote Site Bonus—were not supported by either Raytheon's internal policies or by U.S. Department of State guidelines for overseas personnel. DCMA recommended approximately $19 million dollars in price reductions to the contract, including approximately $11 million in reductions to the emoluments alone.  By the time DCMA made these audit findings, Raytheon employees, including Raytheon Employee 4, had internally already targeted several of these emoluments for reduction: Per Diem, Completion Bonus, and Remote Site Bonus.

48.     In or around December 2017, Raytheon employees at the direction of Raytheon Employee 4, began drafting a response to the DCMA Audit Report.  The response sought to convince the government of the need to continue funding the emoluments at the lucrative FOS1 levels ("Emolument Justification Memorandum").

49.     Both Raytheon Employee 4 and Raytheon Employee 5 provided substantive input to the Emolument Justification Memorandum.  Raytheon Employee 5 wrote "Would like to add words of we bid just like ongoing successful FOS1 program that has become the expectation of the customer and end user for support.  Can't we add this?"  With respect to the Per Diem and Completion Bonus, specifically, Raytheon Employee 5 wrote "state same as FOS1."  Raytheon Employee 4 responded that she "agreed" with Raytheon Employee 5 and implemented these edits, as well as other substantive edits about the need to minimize attrition, to the draft.  Raytheon Employee 4 then sent the "final" draft to Raytheon Employee 5 and others.  Raytheon Employee 5 responded, "I'm good with this."  She also wrote, "I reviewed, and you all did a fantastic job with the writeup. . . .  I like saying right up front the comment that its just like FOS1 which is a successfully executed program."

50.     On or about December 9, 2017, Raytheon Employee 4 and another Raytheon employee submitted the Emolument Justification Memorandum to U.S. Air Force personnel.  The Memorandum emphasized that maintaining the emoluments at FOS1 levels was necessary for the continued success of the SRP program, noting that the emoluments were bid "in the same way that the successful SRP FOS1 program is currently being executed and has become the expectation of the customer and end-user."  It explained that Raytheon had policy waivers for the SRP emoluments to "minimize personnel attrition and maintain the staff who have been through rigorous training to maintain and operate the [radar] with the required security clearances."

51.     The Emolument Justification Memorandum further defended each of the challenged emoluments.  For example, in order to justify the remote site bonus, the Memorandum described "extreme weather events" and "treacherous narrow winding roads," and included a picture of a tarantula with the caption "Watch What You Grab at the dorm" and a

picture of a hornet with the caption "Asian Giant Hornet/Tigerhead Bee-Fatality . . . .".  In or around December 12 through December 15, 2017, after submitting the Emolument Justification Memorandum, Raytheon employees, including Raytheon Employee 4 as the senior-most Raytheon employee present, met with U.S. Air Force representatives to continue negotiating the FOS2 contract in person.  At the meetings, these Raytheon employees reiterated that the U.S. Air Force should fund the emoluments in the FOS2 contract at the lucrative FOS1 levels, consistent with the arguments put forth in the Emolument Justification Memorandum.

52.     Throughout negotiations, Raytheon Employee 4 and Raytheon Employee 5 did not disclose that Raytheon Employee 4 and others had identified emolument reductions as a profit-generating "opportunity" and that Raytheon was planning to reduce the emoluments after the contract was awarded.  Instead, Raytheon Employee 4 and Raytheon Employee 5 falsely and fraudulently argued to the United States that continuing to pay the emoluments to the maintainers at FOS1 levels was essential for the successful execution of FOS2 and that it was essential to avoid maintainer attrition.  In doing so, Raytheon Employee 4 and Raytheon Employee 5 intended, at least in part, to benefit Raytheon.

53.     The U.S. Air Force relied on Raytheon's misrepresentations, including those made by Raytheon Employee 4 and Raytheon Employee 5, concerning the necessity of the emoluments, and, on or about December 15, 2017, agreed to a contract price for FOS2 that funded the FOS2 emoluments at FOS1 levels.

54.     On or about December 22, 2017, Raytheon submitted a signed TINA Certificate to the U.S. Air Force, representing that "the cost and pricing data . . . submitted" as part of its proposal—including the emolument costs that had been bid at FOS1 levels—was "accurate, complete, and current as of 15 December 2017."  This certification was false because Raytheon

did not disclose that Raytheon Employee 4 and others planned to reduce the emoluments post contract award and reallocate a portion of those funds as cost savings.

55.     On or about December 29, 2017, the U.S. Air Force formally awarded the FOS2 contract to Raytheon and funded the emoluments at the lucrative FOS1 levels.

### *Raytheon Begins Emolument Reductions Immediately After the FOS2 Award and Conceals the Reductions from the Air Force*

56.     After the U.S. Air Force awarded the FOS2 contract, Raytheon employees immediately began working to implement the reductions to maintainer emoluments that they had previously discussed at the MOU shaping meetings in the fall of 2017, consistent with the plan to cut emoluments after contract award.

57.     On or about January 6, 2018—less than a week after contract award, and less than a month after arguing to the U.S. Air Force that the emoluments were necessary to the success of the radar program—Raytheon Employee 4 sent out an invitation for an internal meeting at Raytheon to address changes to the MOUs. In January and February 2018, Raytheon Employee 4 hosted several additional meetings regarding emolument reductions.  The contemplated reductions mirrored the approximately $11 million in reductions that DCMA had proposed in December 2017—namely, reductions or elimination of DSID, Hardship, Per Diem, Completion Bonus, and Remote Site Bonus.

58.     In a February 22, 2018 email, Raytheon Employee 4 justified these cuts to Raytheon employees as necessary "to align and comply with [Raytheon] imposed changes being applied to MOUs across all [Raytheon] business."  As noted above, however, just a few weeks earlier, Raytheon Employee 4 and others defended the emoluments to the United States as consistent with Raytheon policy.  In fact, the decision to reduce emoluments was made in order to cut costs and increase profit.

59. In or around February 2018, Raytheon employees incorporated emolument reduction into the contract baseline, or budget, for FOS2, reducing the line item associated with maintainer compensation by 20%, or approximately $10.5 million.

60. In or around March and April 2018, Raytheon employees supporting the finance function on the program began working on "Gate 5," a post-award review of the FOS2 contract performance and baseline with several Raytheon managers, including Raytheon Employee 4, Raytheon Employee 5, and their supervisor, a Raytheon executive. The Gate 5 review showed that FOS2's profit rate had increased by over 5 percentage points in the three months since the contract was awarded, from the 13.9% negotiated with the U.S. Air Force in December 2017 to 19.7%. In an email on or about March 27, 2018, the SRP Business Manager observed that the profit increase was due, among other things, to "efficiencies in site deployment packages"—that is, the emolument reductions.

61. On or about May 10, 2018, Raytheon employees, including Raytheon Employee 4, traveled to Partner-1 to present the new, reduced emolument package to the maintainers.

62. During the presentation, Raytheon Employee 4 justified the changes with arguments that mirrored those made by DCMA during contract negotiations and contradicted Raytheon's own representations to the government during those negotiations. These assertions to maintainers directly contradicted statements made to the U.S. Air Force during FOS2 negotiations and in the Emolument Justification Memorandum.

63. In or around June 2018, after Raytheon announced the new emolument packages, many maintainers left, or threatened to leave, their positions on FOS2 due to the emolument reductions. Faced with a staffing crisis, Raytheon agreed to increase or restore certain emoluments, a process that continued throughout 2018 and beyond and that ultimately resulted in

the restoration of millions of dollars of emoluments that had been previously reduced or eliminated.  Nevertheless, Raytheon never restored the emoluments to the levels the United States had awarded, allowing the company to retain millions of dollars in additional profit on the FOS2 contract.

64. During a quarterly review meeting on or about October 12, 2018, Raytheon Employee 4 informed U.S. Air Force officials responsible for administering the FOS2 contract about the radar site attrition.  However, Raytheon Employee 4 failed to disclose that these emolument reductions were the primary reason for the employee departures.  Instead, Raytheon Employee 4 falsely and fraudulently stated that the attrition was only due to retirement, health issues, and a desire to return home to their families, thereby concealing from the United States that Raytheon had cut emoluments despite demanding and receiving full funding for them on the basis of its contention that they could not be cut.

65. As a result of Raytheon's fraud in connection with FOS2 negotiations and award, the U.S. Air Force agreed to a contract price for FOS2 that was fraudulently inflated by $11,072,009.