ATTACHMENT D

**INDEPENDENT COMPLIANCE MONITOR**

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of Raytheon Company (the "Company"), on behalf of itself and its subsidiaries and controlled affiliates, and RTX Corporation ("RTX") (together, the "Companies"), with respect to the Monitor, United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office for the District of Massachusetts (the "Office") are as described below:

1.     The Company will retain the Monitor for a period of three years (the "Term of the Monitorship"), unless either the extension or early termination provision of Paragraph 3 of the Deferred Prosecution Agreement (the "Agreement") is triggered.

*Monitor's Mandate*

2.     The Monitor's primary responsibility is to assess and monitor the Companies' compliance with the terms of the Agreement, including the Corporate Compliance Program in Attachment C, to specifically address and reduce the risk of any recurrence of the Company's misconduct.  The Monitor's mandate does not extend to the subsidiaries, affiliates, divisions, or businesses of RTX other than the Company and the Company's subsidiaries and affiliates. During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the effectiveness of the internal controls, compliance policies and procedures of the Company as they relate to the Company's current and ongoing compliance with U.S. anti-fraud laws and the Truthful Cost or Pricing Data Act, formerly known as the Truth in Negotiations Act ("TINA"), 10 U.S.C. §§ 3701-3708; 41 U.S.C. §§ 3501-3508, and take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate").  This Mandate

shall include an assessment of the RTX's and the Company's Boards of Directors' and senior management's commitment to, and effective implementation of, the corporate compliance program described in Attachment C of the Agreement.

*Companies' Obligations*

3. The Companies shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Company's compliance program in accordance with the principles set forth herein and subject to applicable law, including applicable data protection and labor laws and regulations. To that end, the Companies shall: facilitate the Monitor's access to the Companies' documents and resources; not limit such access, except as provided in Paragraphs 5-6; and provide guidance on applicable local law (such as relevant data protection and labor laws). The Companies shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement. The Companies shall use their best efforts to provide the Monitor with access to the Companies' former employees and to their third-party vendors, agents, and consultants (collectively, "agents and business partners"), as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement. The Company shall inform agents and business partners of this obligation. Fees and costs associated with the Monitorship shall be expressly unallowable costs for Government contract accounting purposes.

4. Any disclosure by the Companies to the Monitor concerning potential violations of the U.S. anti-fraud laws shall not relieve RTX or the Company of any otherwise applicable

obligation to truthfully disclose such matters to the Fraud Section and the Office, pursuant to the Agreement.

*Withholding Access*

5.  The parties agree that no attorney-client relationship shall be formed between the Companies and the Monitor.  In the event that the Companies seek to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Companies that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Companies reasonably believe production would otherwise be inconsistent with applicable law, the Companies shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

6.  If the matter cannot be resolved, at the request of the Monitor, the Companies shall promptly provide written notice to the Monitor, the Fraud Section, and the Office.  Such notice shall include a general description of the nature of the information, documents, records, facilities, or current or former employees that are being withheld, as well as the legal basis for withholding access.  The Fraud Section and the Office may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.  Any such request would be made pursuant to the cooperation provisions set forth in Paragraph 5 of the Agreement.

*Monitor's Coordination with the
Companies and Review Methodology*

7.  In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with the Companies' personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis.  The Monitor may rely on the product of the Companies' processes, such as the results of studies, reviews, sampling and

testing methodologies, audits, and analyses conducted by or on behalf of the Companies, as well as the Companies' internal resources (*e.g.*, legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Company/RTX-specific expertise, provided that the Monitor has confidence in the quality of those resources.

8. The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets. In carrying out the Mandate, the Monitor should consider, for instance, risks presented by: (a) the industries in which the Company operates; (b) the nature of the Companies' customers and business partners; (c) current and future business opportunities and transactions; (c) financial reporting obligations; and (d) business interactions with government officials, including the amount of government regulation and oversight of the Company in conducting its business affairs.

9. In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things: (a) inspection of relevant documents, including the Companies' current policies and procedures governing compliance with U.S. anti-fraud laws and the Truth in Negotiations Act; (b) on-site observation of selected systems and procedures of the Company at sample sites, including internal controls, record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Company's compliance program.

*Monitor's Written Work Plans*

10. To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial ("first") review and prepare a first report, followed by at least two follow-up reviews and reports as described in Paragraphs 16-19 below. With respect to the first report, after consultation with the Companies, the Fraud Section, and the Office, the Monitor shall prepare the first written work plan within sixty (60) calendar days of being retained, and the Companies, the Fraud Section, and the Office shall provide comments within thirty (30) calendar days after receipt of the written work plan. With respect to each follow-up report, after consultation with the Companies, the Fraud Section, and the Office, the Monitor shall prepare a written work plan at least thirty (30) calendar days prior to commencing a review, and the Companies, the Fraud Section, and the Office shall provide comments within twenty (20) calendar days after receipt of the written work plan. Any disputes between the Companies and the Monitor with respect to any written work plan shall be decided by the Fraud Section and the Office in their sole discretion.

11. All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the first review shall include such steps as are reasonably necessary to conduct an effective first review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement. In developing such understanding, the Monitor is to rely, to the extent possible, on available information and documents provided by the Companies. It is not intended that the

Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*First Review*

12.The first review shall commence no later than one hundred twenty (120) calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Companies, the Monitor, the Fraud Section, and the Office).  The Monitor shall issue a written report within one hundred fifty calendar (150) days of commencing the first review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Company's program for ensuring compliance with U.S. anti-fraud laws and Truthful Cost or Pricing Data Act, formerly known as TINA, 10 U.S.C. §§ 3701-3708; 41 U.S.C. §§ 3501-3508.  The Monitor should consult with the Companies concerning his or her findings and recommendations on an ongoing basis and should consider the Companies' comments and input to the extent the Monitor deems appropriate.  The Monitor may also choose to share a draft of his or her reports with RTX or the Company prior to finalizing them.  The Monitor's reports need not recite or describe comprehensively the Company's history or compliance policies, procedures and practices. Rather, the reports should focus on areas the Monitor has identified as requiring recommendations for improvement or which the Monitor otherwise concludes merit particular attention.  The Monitor shall provide the report to the Boards of Directors of the Companies and contemporaneously transmit copies to

>Deputy Chief – MIMF Unit
>Deputy Chief – CECP Unit
>Criminal Division, Fraud Section
>U.S. Department of Justice
>1400 New York Avenue N.W.
>Bond Building, Third Floor
>Washington, D.C. 20005

>Chief, Securities, Financial and Cyber Fraud Unit
>U.S. Attorney's Office
>District of Massachusetts
>John Joseph Moakley United States Federal Courthouse
>1 Courthouse Way, Suite 9200
>Boston, MA 02210

After consultation with the Companies, the Monitor may extend the time period for issuance of the first report for a brief period of time with prior written approval of the Fraud Section and the Office.

13. Within one hundred fifty (150) calendar days after receiving the Monitor's first report, the Companies shall adopt and implement all recommendations in the report. If RTX or the Company considers any recommendations unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable, they must notify the Monitor, the Fraud Section, and the Office of any such recommendations in writing within sixty (60) calendar days of receiving the report. The Companies need not adopt those recommendations within the one hundred fifty (150) calendar days of receiving the report but shall propose in writing to the Monitor, the Fraud Section, and the Office an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Companies and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within forty-five (45) calendar days after the Company or RTX serves the written notice.

14. In the event the Companies and the Monitor are unable to agree on an acceptable alternative proposal, RTX or the Company shall promptly consult with the Fraud Section and the Office. The Fraud Section and the Office may consider the Monitor's recommendation and the Companies' reasons for not adopting the recommendation in determining whether the Companies have fully complied with their obligations under the Agreement. Pending such

determination, the Companies shall not be required to implement any contested recommendation(s).

15. With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred fifty (150) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section and the Office.

*Follow-Up Reviews*

16. A follow-up review shall commence no later than one hundred and eighty (180) calendar days after the issuance of the first report (unless otherwise agreed by the Companies, the Monitor, the Fraud Section, and the Office). The Monitor shall issue a written follow-up ("second") report within one hundred twenty (120) calendar days of commencing the second review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 with respect to the first review. After consultation with the Companies, the Monitor may extend the time period for issuance of the second report for a brief period of time with prior written approval of t the Fraud Section and the Office.

17. Within one hundred twenty (120) calendar days after receiving the Monitor's second report, the Companies shall adopt and implement all recommendations in the report, unless, within thirty (30) calendar days after receiving the report, the Companies notify in writing the Monitor, the Fraud Section, and the Office concerning any recommendations that the Companies consider unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Companies need not adopt that recommendation within the one hundred twenty (120) calendar days of receiving the report but shall propose in writing to the Monitor,

the Fraud Section, and the Office an alternative policy, procedure, or system designed to achieve the same objective or purpose.  As to any recommendation on which the Companies and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) calendar days after the Companies serve the written notice.

18. In the event the Companies and the Monitor are unable to agree on an acceptable alternative proposal, the Companies shall promptly consult with the Fraud Section and the Office.  The Fraud Section and the Office may consider the Monitor's recommendation and the Companies' reasons for not adopting the recommendation in determining whether the Companies have fully complied with their obligations under the Agreement.  Pending such determination, the Companies shall not be required to implement any contested recommendation(s).

19. With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred twenty (120) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section and the Office.

20. The Monitor shall undertake a second follow-up ("third") review not later than one hundred fifty (150) days after the issuance of the second report (unless otherwise agreed by the Companies, the Monitor, and the Offices). The Monitor shall issue a third report within one hundred and twenty (120) days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 16-18.  Following the third review, the Monitor shall certify whether the Company's Corporate Compliance Program, including its policies, procedures, and internal controls, is reasonably designed and implemented to prevent and detect violations of U.S. anti-fraud laws and the Truthful Cost or Pricing Data Act, formerly known as

TINA, 10 U.S.C. §§ 3701-3708; 41 U.S.C. §§ 3501-3508.  The final review and report shall be completed and delivered to the Fraud Section and the Office no later than thirty (30) days before the end of the Term.  If, by the third review, the Monitor assesses that the Company's Corporate Compliance Program is not reasonably designed and implemented to prevent and detect violations of the U.S. anti-fraud laws and the Truthful Cost or Pricing Data Act, formerly known as TINA, 10 U.S.C. §§ 3701-3708; 41 U.S.C. §§ 3501-3508, the Fraud Section and the Office may, in their sole discretion, declare a breach or extension of the Agreement or the Monitorship.

*Monitor's Discovery of Potential or Actual Misconduct*

21. (a) Except as set forth below in sub-paragraphs (b), (c) and (d), should the Monitor discover during the course of his or her engagement that any director, officer, employee, agent, third-party vendor, or consultant of the Company may have engaged in unlawful activity in violation of U.S. anti-fraud laws or the Truthful Cost or Pricing Data Act, formerly known as TINA, 10 U.S.C. §§ 3701-3708; 41 U.S.C. §§ 3501-3508 ("Potential Misconduct"), the Monitor shall immediately report the Potential Misconduct to RTX's or the Company's General Counsel, Chief Compliance Officer, and/or Audit Committee for further action, unless the Potential Misconduct was already so disclosed.  The Monitor also may report Potential Misconduct to the Fraud Section and the Office at any time, and shall report Potential Misconduct to the Fraud Section and the Office when it requests the information.

(b) In some instances, the Monitor should immediately report Potential Misconduct directly to the Fraud Section and the Office and not to the Company. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Fraud Section and the Office and not to the Company, namely, where the Potential Misconduct: (1) poses a risk to U.S. national security, public health or safety or the environment; (2) involves

senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c) If the Monitor believes that any Potential Misconduct has occurred or may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Fraud Section and the Office. When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Fraud Section and the Office, and, in such cases, disclosure of the Actual Misconduct to the General Counsel, Chief Compliance Officer, and/or the Audit Committee of the Company should occur as the Fraud Section and the Office and the Monitor deem appropriate under the circumstances.

(d) The Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Fraud Section and the Office or not.

(e) Further, if the Companies or any entity or person working directly or indirectly for or on behalf of the Companies withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the Fraud Section and the Office and address the Companies' failure to disclose the necessary information in his or her reports.

(f) Neither the Companies nor anyone acting on their behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

*Meetings During Pendency of Monitorship*

22. The Monitor shall meet with the Fraud Section and the Office within thirty (30) calendar days after providing each report to the Fraud Section and the Office to discuss the report, to be followed by a meeting between the Fraud Section, the Office, the Monitor, and the Companies.

23. At least annually, and more frequently if appropriate, representatives from the Companies and the Fraud Section and the Office will meet to discuss the monitorship and any suggestions, comments, or improvements the Companies may wish to discuss with or propose to the Fraud Section and the Office, including with respect to the scope or costs of the monitorship.

*Contemplated Confidentiality of Monitor's Reports*

24. The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the monitorship. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section and the Office determine in their sole discretion that disclosure would be in furtherance of the Fraud Section and the Office's discharge of their duties and responsibilities or is otherwise required by law.